IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

MARK MASON ALEXANDER,

Defendant.

CRIMINAL ACTION FILE
NO.  4:11-CR-036-HLM-WEJ

## <u>NON-FINAL REPORT AND RECOMMENDATION</u>

This matter is before the Court on defendant Mark Mason Alexander's Motion
to Suppress Statements [21].  The Court conducted an evidentiary hearing on said
Motion on February 9, 2012 [31], which has been transcribed [36] (hereafter "Tr.").
The parties have briefed the issue.  (<u>See</u> Def.'s Arg. in Resp. to the Mot. to Supp.
Hr'g [40] ("Def.'s Br."); Gov't Resp. to Def.'s Mot. to Supp. Statements [42]
("Gov't Br.").)

On the basis of the testimony and evidence produced at that hearing, the
undersigned **REPORTS** that law enforcement officers complied with the
requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and that defendant made

any incriminating statement voluntarily.  Thus, the undersigned **RECOMMENDS**

that defendant's Motion to Suppress Statements [21] be **DENIED**.

## I.     STATEMENT OF FACTS

The record shows that Mr. Alexander had numerous contacts with law enforcement officers from July 2007 through his arrest in October 2011, as summarized below.

### A.     Contact in July 2007

In July 2007, Special Agent ("SA") Jonathan Barnes of the United States Department of Commerce, along with Special Agent Gordon Pomray, met Mr. Alexander at the offices of Hydrajet in Dalton, Georgia. (Tr. 6-7.) This meeting was part of an outreach program designed to educate exporters about the trade embargos and the regulations for exporting goods from the United States.  (Id. at 7.)  During the course of that meeting, SA Barnes provided contact information, including his cell phone number, to defendant.  (Id.)

### B.     Contact in July 2008

On July 8, 2008, Mr. Alexander called SA Barnes's cell phone to advise him that the Department of Homeland Security ("DHS") had conducted a border search in Atlanta upon his return to the United States from the Middle East, and that certain

2

items, including his laptop computer, cell phones, and some documents, had been seized. (Tr. 6-7, 24-25, 26.)[1] Mr. Alexander asked SA Barnes for assistance in obtaining the return of his items, especially his cell phones. (Id. at 7.) SA Barnes responded that he would contact his colleagues at DHS and see what he could do. (Id. at 8.) Because Mr. Alexander was interested in a speedy return of his items, SA Barnes suggested that the fastest alternative was for defendant to sign a consent to search form; this would allow the Department of Commerce to obtain the items from DHS and search them (particularly, the laptop computer) without expending time to secure a search warrant. (Id. at 8-9.)

During that conversation, Mr. Alexander mentioned to SA Barnes that he would be in south Florida (where SA Barnes's office is located) soon, that DHS had already searched his cell phones, and that DHS had agreed to send them to SA Barnes so that he could return them to defendant; in this way, Mr. Alexander could pick up the cell phones while in Florida without having to return to Atlanta where

---

[1] The Department of Commerce did not direct DHS to conduct that border search and seizure. (Tr. 25, 27.) However, it had informed DHS of the investigation into Mr. Alexander's activities. (Id. at 25-26.) A DHS agent gave SA Barnes's name and cell phone number to Mr. Alexander. (Id. at 26-27.)

AO 72A
(Rev.8/82)

they had been seized.  (Id. at 9-10.)  SA Barnes agreed to meet with defendant.  (Id. at 10.)

Mr. Alexander met with SA Barnes in his Fort Lauderdale office on July 10, 2008, for about fifteen minutes.  (Tr. 10-11, 27-28.)  Mr. Alexander was interested in finding out why he had been stopped at the airport and in getting his cell phones back.  (Id. at 10.)  SA Barnes returned the cell phones and Mr. Alexander left.  (Id. at 11.)[2]  During this brief meeting, Mr. Alexander appeared coherent; SA Barnes did not threaten Mr. Alexander to get him to speak with him.  (Id.)  SA Barnes did not provide Miranda rights to Mr. Alexander in this meeting.  (Id. at 28.)

### C.  Contact in August 2008

On August 1, 2008, Mr. Alexander unexpectedly appeared at a DHS office in East Point, Georgia.  (Tr. 36-37.)  SA Robert Roy (accompanied by SA Chris Chase) introduced himself to defendant and then gathered and returned certain items to Mr. Alexander (i.e., a laptop computer, miscellaneous documents, CD-ROMs, and two personal digital assistants) that had been seized by U.S. Customs during a border search the previous month.  (Id. at 37-38.)  As SA Roy returned the items, he asked

---

[2] Although Mr. Alexander was originally from Jordan, he is a naturalized U.S. citizen.  (Tr. 11.)  In SA Barnes's experience, Mr. Alexander speaks and understands the English language.  (Id. at 11, 24.)

4

Mr. Alexander if he cared to speak about his line of work or just talk to the agents for a little while. (Id. at 38.) Mr. Alexander replied that he would. (Id.) Their conversation lasted about twenty minutes. (Id. at 38-39, 41.)[3] SA Roy did not issue Miranda rights to Mr. Alexander on this occasion. (Id. at 41-42.)

On August 13, 2008, agents executed a search warrant at Mr. Alexander's residence in Dalton, Georgia, and at Hydrajet. (Tr. 12, 29.) The next day, Mr. Alexander called SA Barnes's cell phone and wanted to talk about the search. (Id. at 12.) SA Barnes (who was in Georgia at the time) agreed to meet with him. (Id.)

On August 14, 2008, Mr. Alexander traveled to Atlanta to meet with SA Barnes. (Tr. 12-13.) SA Barnes, accompanied by SA Roy, spoke to defendant. (Id. at 13, 28, 39-40.) Before their conversation began, SA Barnes advised Mr. Alexander that he was not required to speak to them or to answer any questions; that he was free to stop the questioning at any time; and that he was free to leave at any time. (Id. at 13, 29, 40, 42-43.)[4] After hearing these warnings, Mr. Alexander elected to stay and talked with the agents for about one hour. (Id. at 13-14, 40.) He

---

[3] During that meeting, Mr. Alexander attempted to solicit the agents' assistance regarding a separate immigration matter. (Tr. 39.)

[4] SA Barnes did not inform Mr. Alexander that he had a right to an attorney and did not show him a waiver of Miranda rights form. (Tr. 29, 42-43.)

AO 72A
(Rev.8/82)

never indicated that he wished to stop the interview. (Id. at 14.) The gentlemen discussed Mr. Alexander's business relationships, some of his sales activities, his ownership of businesses in the United States and abroad, and transactions dealing with Iran. (Id.) At the conclusion of the meeting, Mr. Alexander left. (Id. at 14, 40-41.)

### D.   Contact in March 2010

On March 18, 2010, Mr. Alexander called SA Barnes on his cell phone. (Tr. 14.) He was upset because on March 16, 2010, he had entered the United States from the Middle East and been subjected again to a border search by DHS at the Orlando, Florida airport during which his laptop computer, cell phone, and documents were detained. (Id. at 14-15, 29.)[5] Mr. Alexander sought the return of his items, but SA Barnes replied that the Department of Commerce did not have them. (Id. at 15.) Also during their conversation, defendant expressed frustration with his deteriorating business relationships, sales to Iran that were causing him problems, and a desire to move forward and get past these problems. (Id.)

---

[5] The Commerce Department had directed DHS to conduct this border search and seize Mr. Alexander's items. (Tr. 30.)

6

### E.    Contact in October 2011

SA Barnes next encountered Mr. Alexander at the International Concourse at Hartsfield-Jackson International Airport on October 17, 2011.  (Tr. 15-17.)[6]  SA Barnes and three other agents[7] met defendant at the gate, placed him in custody, and escorted him to an airport office (which was approximately twelve by twelve feet in size).  (Id. at 17-18, 32.)[8]  At no time did an officer draw a weapon on defendant or place him in handcuffs.  (Id. at 19.)

Once in the office, SA Barnes verbally advised Mr. Alexander of the Miranda rights.  (Tr. 20.)  After reading each right to Mr. Alexander, SA Barnes asked him if he understood those rights; defendant replied that he did.  (Id.)  To memorialize the fact that he had indicated his understanding of those rights, SA Barnes provided

---

[6] Mr. Alexander had telephoned SA Barnes the prior week, claiming that he was aware of individuals making illegal sales from the United States to Iran.  He indicated that he was returning to the United States. (Tr. 16, 30-31.)  SA Barnes did not inform Mr. Alexander that he would be arrested upon his return.  (Id. at 31.)

[7] SA Barnes and SA Martin Kautz were dressed in street clothes and wore sidearms concealed under their shirts.  (Tr. 18-19.)  The two Customs and Border Protection ("CBP") SAs were dressed in blue uniforms and wore duty sidearms in their holsters.  (Id.)

[8] Only SA Barnes and CBP SA Chris Morris were in the office with defendant. (Tr. 18.)

AO 72A
(Rev.8/82)

Mr. Alexander with a written waiver of rights form. (Id. at 20-21.) SA Barnes informed defendant that if he were willing to talk, then he would need to sign and print his name on that form. (Id. at 21.) Mr. Alexander then executed the wavier form in the presence of SA Barnes, witnessed by CBP SA Morris. (Id. at 21-22; see also Gov't Ex. 1 (executed waiver of rights form).)

After execution of the waiver of rights form, Mr. Alexander spoke to SA Barnes for about one hour. (Tr. 22-23.) They discussed the names of individuals whom defendant claimed were making illegal sales to Iran. (Id. at 23.) SA Barnes testified that no one threatened or coerced Mr. Alexander on October 17 (or on any other occasion) so that he would speak to law enforcement. (Id.) SA Barnes also testified that no one promised Mr. Alexander anything on October 17 (or on any other occasion) so that he would speak to law enforcement. (Id.) Mr. Alexander also did not appear to be under the influence of any substance on October 17; he appeared to understand all questions; and he gave answers that were responsive to the agents' questions. (Id. at 23-24.) Following the interview, SA Barnes placed Mr. Alexander under arrest for the charges in the Indictment. (Id. at 16, 24.)

## II.   THE CHARGING DOCUMENT

On September 27, 2011, the grand jury returned a single count Indictment [1] against Mr. Alexander alleging his participation in a conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ("IEEPA"), all in violation of 18 U.S.C. § 371.  In his position as majority owner of, and Chief Operating Officer for, a Dalton, Georgia-based business called Hydrajet Technology, LLC, the Indictment accuses Mr. Alexander of selling equipment to the Republic of Iran in violation of a trade embargo established by IEEPA and various Executive Orders.  (Indict. ¶¶ 1-12.)

## III.   CONTENTIONS OF THE PARTIES

Defendant argues that he did not voluntarily waive his Miranda rights; thus he contends that any incriminating statements he made to law enforcement officers must be suppressed. (Def.'s Br. 2.) The Government responds that defendant's statements are admissible because they were made voluntarily.  (Gov't Br. 2.)

## IV.   ANALYSIS

In Jackson v. Denno, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be

AO 72A
(Rev.8/82)

heard by a jury. Title 18 U.S.C. § 3501(a) codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." <u>United States v. Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

A two-part inquiry determines the admissibility of a confession or self-incriminating statement. First, the Court must consider whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Second, if those requirements were met, the Court must consider whether the confession or self-incriminating statement was voluntary. <u>United States v. Jones</u>, 32 F.3d 1512, 1516 (11th Cir. 1994) (per curiam); <u>United States v. Sims</u>, 719 F.2d 375, 378 (11th Cir. 1983) (per curiam). The Court makes these inquiries separately below.

### A.    <u>Compliance with Miranda</u>

In <u>Miranda</u>, the Supreme Court noted that, "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478. Therefore, the Court held that the procedural

10

safeguard of warning the suspect of his constitutional rights must be instituted to protect the privilege. Id. at 478-79. These so-called Miranda warnings "are required before any statement may be admitted into evidence at trial which was elicited from a person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

Mr. Alexander had the following contacts with law enforcement:

1. July 2007            educational meeting with SA Barnes;

2. July 2008            border search by DHS (Atlanta);

3. July 8, 2008         telephone call to SA Barnes;

4. July 10, 2008        meeting with SA Barnes;

5. August 1, 2008       meeting with SA Roy;

6. August 14, 2008      telephone call to SA Barnes;

7. August 14, 2008      meeting with SA Barnes and SA Roy;

8. March 16, 2010       border search by DHS (Orlando);

9. March 18, 2010       telephone call to SA Barnes;

10. October 2011        telephone call to SA Barnes; and

11. October 17, 2011    arrest and interview with SA Barnes.

AO 72A
(Rev.8/82)

The record shows that ten of the eleven contacts were non-custodial. For example, the first contact (i.e., July 2007) was an educational meeting. Four of the contacts were telephone calls initiated by Mr. Alexander (i.e., July 8, 2008; August 14, 2008; March 18, 2010, and October 2011). Two of those contacts were border searches (i.e., July 2008 and March 16, 2010) as defendant passed through an airport. These merit no further discussion because, as noted above, the Miranda warnings are only required when the accused is interrogated while in custody. Endress, 880 F.2d at 1248.[9]

The non-custodial interrogations of July 10, 2008, August 1, 2008, and August 14, 2008, merit further discussion because of Beckwith v. United States, 425 U.S. 341 (1976). In that case, the Court held that a "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined.'" Id. at 348 (quoting Rogers v. Richmond, 365 U.S. 534, 544

_____

[9] Additionally, at the February 9, 2012 hearing, the Government indicated that it would not be using any statement that Mr. Alexander may have made during the July 2007 educational meeting, the July 2008 border search, the August 14, 2008 telephone call, the March 16, 2010 border search, and the October 2011 telephone call were not at issue. (See Feb. 9, 2012 Hr'g Tr. [36] 3-4.)

AO 72A
(Rev.8/82)

(1961)). Thus, the question is whether defendant made statements because his free will was overborne by virtue of the interrogative conduct of the agents. <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961) (statements may be admitted if they are "the product of an essentially free will and unconstrained choice of [their] maker").

There is no evidence that the behavior of SA Barnes or SA Roy was such as to overbear Mr. Alexander's will to resist and bring about incriminating statements that were not freely self-determined. The meeting with SA Barnes on July 10, 2008, occurred after defendant requested assistance regarding items seized during a border search. Moreover, the record reflects that defendant initiated the conversation during this meeting. Hence, there is no evidence that SA Barnes employed any interrogative techniques that overborne defendant's will to speak.

The second meeting occurred after defendant appeared unannounced at a DHS office on August 1, 2008. Contrary to defendant's assertions, the record reflects that Mr. Alexander made statements to SA Roy <u>after</u> he returned the items. Consequently, there is no evidence that the agents engaged in overreaching conduct to make defendant speak on that date.

The third meeting occurred on August 14, 2008, also at Mr. Alexander's request. Before speaking with the agents, SA Barnes advised him that he did not

have to speak, that he could stop the interview at any time, and that he was free to leave at any time. After the meeting, defendant left. Thus, the record again demonstrates that defendant was not coerced into making a statement on this date. Thus, there was no obligation to provide Miranda warnings during any of the three non-custodial interrogations.

The only custodial interrogation necessitating Miranda warnings occurred on October 17, 2011, when agents arrested defendant at the Atlanta airport. On this occasion, SA Barnes advised defendant of his <u>Miranda</u> rights both orally and in writing. Defendant acknowledged by signing the waiver of rights form that he understood his rights and was willing to talk. He spoke to the agents and never exercised his rights to remain silent or to speak to a lawyer. Therefore, the undisputed evidence shows that defendant received notice of his rights before he was subjected to custodial interrogation and made any incriminating statements. Thus, the Government has established the first prong of the two-part inquiry.

### B. <u>Voluntariness</u>

Determining whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. <u>Jones</u>, 32 F.3d at 1516. In

14

<u>Arizona v. Fulminate</u>, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. <u>Jones</u>, 32 F.3d at 1516-17. The standard applied in the Eleventh Circuit is as follows:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

<u>United States v. Mendoza-Cecelia</u>, 963 F.2d 1467, 1475 (11th Cir. 1992).

In this case, the evidence shows that Mr. Alexander was not subjected to an exhaustingly long interrogation. Instead, the interrogation lasted for about an hour. Moreover, physical force was neither applied to Mr. Alexander nor threatened against him. He also was not promised anything to induce an confession. Thus, under the totality of the circumstances, Mr. Alexander made a knowing, voluntary, and intelligent waiver of his right to remain silent. Therefore, any incriminating statements should not be suppressed.

15

Defendant contends that the "continuous harassment" that he suffered upon his arrival in the United States broke down his free will. (Def.'s Br. 3.) However, two border searches separated by eighteen months does not constitute continuous harassment. Moreover, defendant submitted no evidence showing that any improper conduct occurred during those two border searches. Finally, there is no evidence that either SA Barnes or SA Roy used the border searches to initiate contact with Mr. Alexander.

Defendant also argues that the agents purposefully withheld his property to force him to speak with them. (Def.'s Br. 3-5.) For example, defendant asserts that SA Barnes told him that if he wanted to get his cell phones returned, he would have to sign a consent to search form for his laptop and come to his (Barnes's) office to retrieve them. (Id. at 4.) However, the record fails to support that argument. The evidence shows instead that Mr. Alexander was interested in the speedy return of his belongings. SA Barnes merely accommodated defendant by obtaining the cellular telephones from DHS to return to defendant, who happened to be in south Florida where the SA's office was located. Therefore, the meeting would not have occurred unless defendant had requested it. More importantly, there is no evidence that SA Barnes made a promise to induce defendant to do or say anything against his will.

16

## V.  CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** that defendant's Motion to Suppress Statements [21] be **DENIED**.

**SO RECOMMENDED**, this 26th day of April, 2012.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA

v.

MARK MASON ALEXANDER,

Defendant.

CRIMINAL ACTION FILE

NO. 4:11-CR-036-HLM-WEJ

## ORDER FOR SERVICE OF
## NON-FINAL REPORT AND RECOMMENDATION

Let this Non-Final Report and Recommendation of the United States

Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and the Court's

Local Criminal Rule 58.1(A)(3)(a), be filed and a copy, together with a copy of this

Order, be served upon counsel for the parties.

Pursuant to 28 U.S.C. § 636(b)(1), each party may file written objections, if

any, to the Non-Final Report and Recommendation within fourteen days of the

receipt of this Order.  Should objections be filed, they shall specify with particularity

the alleged error(s) made (including reference by page number to any transcripts if

applicable) and shall be served upon the opposing party.  The party filing objections

will be responsible for obtaining and filing the transcript of any evidentiary hearing

for review by the District Court. If no objections are filed, the Non-Final Report and Recommendation may be adopted as the opinion and order of the District Court, and any appellate review of factual findings will be limited to a plain error review. United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983) (per curiam).

The Clerk is directed to submit the Non-Final Report and Recommendation with objections, if any, to the District Court after expiration of the above time period.

**SO ORDERED**, this 26th day of April, 2012.

_Walter E. Johnson_
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

2