IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF
AMERICA

v.

MARK MASON
ALEXANDER.

CRIMINAL ACTION FILE
NO. 4:11-CR-036-01-HLM

## ORDER

This case is before the Court on Defendant's Motion to

Suppress Statements [21], and on the Non-Final Report and

Recommendation of United States Magistrate Judge Walter

E. Johnson [48].

## I.     Standard of Review

28 U.S.C. § 636(b)(1) requires that in reviewing a

magistrate judge's report and recommendation, the district

court "shall make a de novo determination of those portions

of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). The Court therefore must conduct a <u>de novo</u> review if a party files "a proper, specific objection" to a factual finding contained in the report and recommendation. <u>Macort v. Prem, Inc.</u>, 208 F. App'x 781, 784 (11th Cir. 2006); <u>Jeffrey S. by Ernest S. v. State Bd. of Educ.</u>, 896 F.2d 507, 513 (11th Cir. 1990); <u>United States v. Gaddy</u>, 894 F.2d 1307, 1315 (11th Cir. 1990); <u>LoConte v. Dugger</u>, 847 F.2d 745, 750 (11th Cir. 1988). If no party files a timely objection to a factual finding in the report and recommendation, the Court reviews that finding for clear error. <u>Macort</u>, 208 F. App'x at 784. Legal conclusions, of course, are subject to de novo review regardless of whether

2

a party specifically objects. <u>United States v. Keel</u>, 164 F. App'x 958, 961 (11th Cir. 2006); <u>United States v. Warren</u>, 687 F.2d 347, 347 (11th Cir. 1982).

## II. Background

### A. Factual Background

From July 2007 through October 2011, when Defendant was arrested, Defendant had numerous contacts with law enforcement officers. The Court summarizes those contacts below.

#### 1. July 2007 Contact

In July 2007, Special Agent ("SA") Jonathan Barnes of the United States Department of Commerce, along with SA Gordon Pomray, met Defendant at the offices of Hydrajet in Dalton, Georgia. (Suppression Hr'g Tr. at 6-7.) This

AO 72A
(Rev.8/8
2)

meeting was part of an outreach program designed to educate exporters about the trade embargos and the regulations for exporting goods from the United States. (Id. at 7.) During the course of that meeting, SA Barnes provided contact information, including his cellular telephone number, to Defendant. (Id.)

## 2. July 2008 Contact

On July 8, 2008, Defendant called SA Barnes's cell phone to advise SA Barnes that the Department of Homeland Security ("DHS") had conducted a border search of Defendant in Atlanta after Defendant returned to the United States from the Middle East, and that DHS had seized certain items, including laptop computer, cell phones, and some documents. (Suppression Hr'g Tr. at 6-

4

7, 24-25, 26.)[1] Defendant asked SA Barnes for assistance in obtaining the return of his items, especially his cell phones. (Id. at 7.) SA Barnes responded that he would contact his colleagues at DHS and see what he could do. (Id. at 8.) Because Defendant was interested in a speedy return of his items, SA Barnes suggested that the fastest alternative was for Defendant to sign a consent to search form, which would allow the Department of Commerce to obtain the items from DHS and search them--particularly, the laptop computer--without expending time to secure a search warrant. (Id. at 8-9.)

---

[1]The Department of Commerce did not direct DHS to conduct that border search and seizure. (Suppression Hr'g Tr. at 25, 27.) The Department of Commerce, however, had informed DHS of the investigation into Defendant's activities. (Id. at 25-26.) A DHS agent gave SA Barnes's name and cell phone number to Defendant. (Id. at 26-27.)

AO 72A
(Rev.8/8
2)

During that conversation, Defendant mentioned to SA Barnes that Defendant would soon be in south Florida, where SA Barnes's office is located, that DHS had already searched Defendant's cell phones, and that DHS had agreed to send the phones to SA Barnes so that he could return them to Defendant, allowing Defendant could pick up the cell phones while in Florida without having to return to Atlanta where DHS had seized the phones. (Id. at 9-10.) SA Barnes agreed to meet with Defendant. (Id. at 10.)

On July 10, 2008, Defendant met with SA Barnes in SA Barnes' Fort Lauderdale office for approximately fifteen minutes. (Suppression Hr'g Tr. at 10-11, 27-28.) Defendant wanted to find out why he had been stopped at the airport, and he wanted to get his cell phones back. (Id.

6

AO 72A
(Rev.8/8
2)

at 10.)  SA Barnes returned the cell phones, and Defendant

left.  (Id. at 11.)[2]  During this brief meeting, Defendant

appeared coherent, and SA Barnes did not threaten

Defendant to get Defendant to speak with him.  (Id.)  SA

Barnes did not provide Miranda rights to Defendant during

this meeting.  (Id. at 28.)

### 3.  August 2008 Contact

On August 1, 2008, Defendant unexpectedly appeared

at a DHS office in East Point, Georgia.  (Suppression Hr'g

Tr. 36-37.)  SA Robert Roy, accompanied by SA Chris

Chase, introduced himself to Defendant and then gathered

---

[2]Defendant was originally from Jordan, and is now a naturalized United States citizen. (Suppression Hr'g Tr. at 11.) SA Barnes testified that, based on his experiences with Defendant, Defendant speaks and understands the English language. (Id. at 11, 24.)

AO 72A
(Rev.8/8
2)

and returned certain items to Defendant, including a laptop computer, miscellaneous documents, CD-ROMs, and two personal digital assistants, that U.S. Customs had seized during a border search that occurred during the previous month. (Id. at 37-38.) As SA Roy returned the items, he asked Defendant if he cared to speak about his line of work or just talk to the agents for a little while. (Id. at 38.) Defendant replied that he would. (Id.) The agents' conversation with Defendant lasted approximately twenty minutes. (Id. at 38-39, 41.)[3] SA Roy did not issue Miranda rights to Defendant on this occasion. (Id. at 41-42.)

---

[3]During that meeting, Defendant attempted to solicit the agents' assistance concerning a separate immigration matter. (Suppression Hr'g Tr. at 39.)

AO 72A
(Rev.8/8
2)

On August 13, 2008, agents executed a search warrant at Defendant's residence in Dalton, Georgia, and at Hydrajet. (Suppression Hr'g Tr. at 12, 29.) On the following day, Defendant called SA Barnes's cell phone and wanted to talk about the search. (Id. at 12.) SA Barnes, who was in Georgia at the time, agreed to meet with Defendant. (Id.)

On August 14, 2008, Defendant traveled to Atlanta to meet with SA Barnes. (Suppression Hr'g Tr. at 12-13.) SA Barnes, accompanied by SA Roy, spoke with Defendant. (Id. at 13, 28, 39-40.) Before the conversation began, SA Barnes advised Defendant that Defendant was not required to speak to the agents or to answer any questions, that Defendant was free to stop the questioning at any time, and that Defendant was free to leave at any time. (Id. at 13, 29,

9

AO 72A
(Rev.8/8
2)

40, 42-43.)[4] After hearing those warnings, Defendant chose to stay, and he talked with the agents for approximately one hour. (Id. at 13-14, 40.) Defendant never indicated that he wished to stop the interview. (Id. at 14.) The agents and Defendant discussed Defendant's business relationships, some of Defendant's sales activities, Defendant's ownership of businesses in the United States and abroad, and transactions dealing with Iran. (Id.) At the conclusion of the meeting, Defendant left. (Id. at 14, 40-41.)

### 4.   March 2010 Contact

On March 18, 2010, Defendant called SA Barnes on his cell phone. (Suppression Hr'g Tr. at 14.) Defendant was

---

[4]SA Barnes did not inform Defendant that he had a right to an attorney, and did not show Defendant a waiver of Miranda rights form. (Suppression Hr'g Tr. at 29, 42-43.)

AO 72A
(Rev.8/8
2)

upset because, when he entered the United States from the Middle East on March 16, 2010, he was subjected to another border search by DHS at the Orlando, Florida airport, during which his laptop computer, cell phone, and documents were detained. (Id. at 14-15, 29.)[5] Defendant sought the return of his items, and SA Barnes replied that the Department of Commerce did not have those items. (Id. at 15.) During the same conversation, Defendant expressed frustration with his deteriorating business relationships, sales to Iran that were causing him problems, and a desire to move forward and get past these problems. (Id.)

---

[5]The Commerce Department had directed DHS to conduct this border search and seize Defendant's items. (Suppression Hr'g Tr. at 30.)

AO 72A
(Rev.8/8
2)

## 5. October 2011 Contact

SA Barnes next encountered Defendant at the International Concourse at Hartsfield-Jackson International Airport on October 17, 2011. (Suppression Hr'g Tr. at 15-17.)[6] SA Barnes and three other agents[7] met Defendant at the gate, placed him in custody, and escorted him to an airport office (which was approximately twelve by twelve feet in size). (Id. at 17-18, 32.)[8] At no time did an officer draw

---

[6]Defendant had telephoned SA Barnes during the previous week, claiming that Defendant was aware of individuals making illegal sales from the United States to Iran. Defendant indicated that he was returning to the United States. (Suppression Hr'g Tr. at 16, 30-31.) SA Barnes did not inform Defendant that he would be arrested upon his return. (Id. at 31.)

[7]SA Barnes and SA Martin Kautz were dressed in street clothes and wore sidearms concealed under their shirts. (Suppression Hr'g Tr. at 18-19.) The two Customs and Border Protection ("CBP") SAs were dressed in blue uniforms and wore duty sidearms in their holsters. (Id.)

[8]Only SA Barnes and CBP SA Chris Morris were in the office

AO 72A
(Rev.8/8
2)

a weapon on Defendant or place Defendant in handcuffs. (Id. at 19.)

Once in the office, SA Barnes verbally advised Defendant of the <u>Miranda</u> rights. (Suppression Hr'g Tr. at 20.) After reading each right to Defendant, SA Barnes asked Defendant if he understood those rights, and Defendant replied that he did. (<u>Id.</u>) To memorialize the fact that Defendant had indicated his understanding of those rights, SA Barnes provided Defendant with a written waiver of rights form. (<u>Id.</u> at 20-21.) SA Barnes informed Defendant that, if Defendant was willing to talk, he needed to sign and print his name on that form. (<u>Id.</u> at 21.) Defendant then executed the waiver form in the presence

_____

with Defendant. (Suppression Hr'g Tr. at 18.)

AO 72A
(Rev.8/8
2)

of SA Barnes, witnessed by CBP SA Morris. (<u>Id.</u> at 21-22; <u>see also</u> Gov't Ex. 1 (consisting of executed waiver of rights form).)

After executing the waiver of rights form, Defendant spoke to SA Barnes for approximately one hour. (Suppression Hr'g Tr. at 22-23.) During that conversation, Defendant and SA Barnes discussed the names of individuals whom Defendant claimed were making illegal sales to Iran. (<u>Id.</u> at 23.) SA Barnes testified that no one threatened or coerced Defendant on October 17, or on any other occasion, to convince Defendant to speak to law enforcement. (<u>Id.</u>) SA Barnes also testified that no one promised Defendant anything on October 17, or on any other occasion, to persuade Defendant to speak to law

AO 72A
(Rev.8/8
2)

enforcement. (Id.) Defendant also did not appear to be under the influence of any substance on October 17; indeed, he appeared to understand all questions and gave answers that were responsive to the agents' questions. (Id. at 23-24.) Following the interview, SA Barnes placed Defendant under arrest for the charges set forth in the indictment. (Id. at 16, 24.)

## B. Procedural Background

On September 27, 2011, a federal grand jury sitting in the Northern District of Georgia returned a single count indictment against Defendant and two co-defendants, alleging that Defendants and his co-defendants participated in a conspiracy to violate the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq. ("IEEPA"),

AO 72A
(Rev.8/8
2)

all in violation of 18 U.S.C. § 371. (Docket Entry No. 1.) The indictment alleges that, in his position as majority owner of, and Chief Operating Officer for, a Dalton, Georgia-based business called Hydrajet Technology, LLC, Defendant sold equipment to the Republic of Iran, in violation of a trade embargo established by IEEPA and various Executive Orders. (Id. ¶¶ 1-12.)

On November 14, 2011, Defendant filed his Motion to Suppress Statements. (Docket Entry No. 21.) On February 9, 2012, Judge Johnson conducted an evidentiary hearing concerning Defendant's Motion to Suppress Statements. (Docket Entry Nos. 31, 36.) On April 26, 2012, Judge Johnson issued his Non-Final Report and

16

AO 72A
(Rev.8/8
2)

Recommendation, in which he recommended that the Court deny Defendant's Motion to Suppress Statements.

As of the date of this Order, the Clerk's docket indicates that Defendant has not filed Objections to the Non-Final Report and Recommendation. The time period in which Defendant could file Objections has expired, and the Court therefore finds that this matter is ripe for resolution.

## III. Discussion

In <u>Jackson v. Denno</u>, 378 U.S. 368, 376-77 (1964), the Supreme Court held that a defendant has a constitutional right to a fair hearing and an independent and reliable determination of the voluntariness of a confession before it is allowed to be heard by a jury. Title 18 U.S.C. § 3501(a)

17

codifies the <u>Jackson v. Denno</u> requirement for criminal prosecutions and provides that, before a confession or self-incriminating statement is received in evidence, "the trial judge shall, out of the presence of the jury, determine any issue as to voluntariness." <u>United States v. Davidson</u>, 768 F.2d 1266, 1270 n.1 (11th Cir. 1985).

When determining whether a confession or self-incriminating statement is admissible, the Court conducts a two-part inquiry. First, the Court considers whether the Government complied with the requirements of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Second, if the Government satisfied those requirements, the Court considers whether the confession or self-incriminating statement was voluntary. <u>United States v. Jones</u>, 32 F.3d 1512, 1516

18

AO 72A
(Rev.8/8
2)

(11th Cir. 1994) (per curiam); <u>United States v. Sims</u>, 719
F.2d 375, 378 (11th Cir. 1983) (per curiam).

### 1. Compliance with Miranda

In <u>Miranda</u>, the Supreme Court stated that, "when an
individual is taken into custody or otherwise deprived of his
freedom by the authorities in any significant way and is
subjected to questioning, the privilege against
self-incrimination is jeopardized." 384 U.S. at 478. The
Court held that the procedural safeguard of warning the
suspect of his constitutional rights must be instituted to
protect the privilege. <u>Id.</u> at 478-79. Those so-called
<u>Miranda</u> warnings "are required before any statement may
be admitted into evidence at trial which was elicited from a

AO 72A
(Rev.8/8
2)

person in custody through interrogation." Endress v. Dugger, 880 F.2d 1244, 1248 (11th Cir. 1989).

Defendant had a number of contacts with law enforcement, including: (1) a July 2007 educational meeting with SA Barnes; (2) a July 2008 border search by DHS in Atlanta; (3) a July 8, 2008 telephone call to SA Barnes; (4) a July 10, 2008 meeting with SA Barnes; (5) an August 1, 2008 meeting with SA Roy; (6) an August 14, 2008 telephone call to SA Barnes; (7) an August 14, 2008 meeting with SA Barnes and SA Roy; (8) a March 16, 2010 border search by DHS in Orlando; (9) a March 18, 2010 telephone call to SA Barnes; (10) an October 2011 telephone call to SA Barnes; and (11) his October 17, 2011 arrest and interview with SA Barnes. The Court

AO 72A
(Rev.8/8
2)

agrees with Judge Johnson that the record demonstrates that ten of the eleven contacts were non-custodial. (Non-Final Report & Recommendation at 12.) The first contact, in July 2007, was an educational meeting. Further, the July 8, 2008, August 14, 2008, March 18, 2010, and October 2011 contacts were telephone calls initiated by Defendant. The July 2008 and March 16, 2010 contacts were border searches that occurred as Defendant passed through airports. The Court agrees with Judge Johnson that those contacts "merit no further discussion because, as noted above, the Miranda warnings are only required when the accused is interrogated while in custody." (Id. (citing Endress, 880 F.2d at 1248).)[9]

---

[9]During the February 9, 2012 hearing, the Government indicated that it would not use any statement that Defendant may

AO 72A
(Rev.8/8
2)

The non-custodial interrogations of July 10, 2008,
August 1, 2008, and August 14, 2008, require further
discussion because of <u>Beckwith v. United States</u>, 425 U.S.
341 (1976). In <u>Beckwith</u>, the Court held that a "noncustodial
interrogation might possibly in some situations, by virtue of
some special circumstances, be characterized as one
where 'the behavior of . . . law enforcement officials was
such as to overbear petitioner's will to resist and bring about
confessions not freely self-determined.'" <u>Id.</u> at 348 (quoting
<u>Rogers v. Richmond</u>, 365 U.S. 534, 544 (1961)). The
Court therefore must determine whether Defendant made
statements because his free will was overborne by virtue of

---

have made during the July 2007 educational meeting, the July 2008
border search, the August 14, 2008 telephone call, the March 16,
2010 border search, and the October 2011 telephone call at trial.
(Suppression Hr'g Tr. at 3-4.)

22

AO 72A
(Rev.8/8
2)

the interrogative conduct of the agents. <u>Culombe v. Connecticut</u>, 367 U.S. 568, 602 (1961) (noting that statements may be admitted if they are "the product of an essentially free will and unconstrained choice of [their] maker").

The Court agrees with Judge Johnson that "[t]here is no evidence that the behavior of SA Barnes or SA Roy was such as to overbear [Defendant's] will to resist and bring about incriminating statements that were not freely self-determined." (Non-Final Report & Recommendation at 13.) As Judge Johnson noted, the July 10, 2008 meeting with SA Barnes occurred after Defendant requested assistance regarding items seized during a border search. (<u>Id.</u>) Additionally, as Judge Johnson points out, the record

23

reflects that Defendant initiated the conversation during that meeting. (Id.) Under those circumstances, Judge Johnson correctly found that "there is no evidence that SA Barnes employed any interrogative techniques that overborne [D]efendant's will to speak" during the July 10, 2008 meeting. (Id.)

The August 1, 2008 meeting occurred after Defendant appeared unannounced at a DHS office. The Court agrees with Judge Johnson that "the record reflects that [Defendant] made statements to SA Roy after [SA Roy] returned the items." (Non-Final Report & Recommendation at 13.) Under those circumstances, Judge Johnson correctly found that "there is no evidence that the agents

engaged in overreaching conduct to make [D]efendant speak on that date." (Id.)

The August 14, 2008 meeting occurred at Defendant's request. As Judge Johnson observed, before Defendant spoke with the agents, SA Barnes advised Defendant that he did not have to speak, that he could stop the interview at any time, and that he was free to leave at any time. (Non-Final Report & Recommendation at 13-14.) Defendant left after the meeting. Given those circumstances, Judge Johnson correctly determined that "[D]efendant was not coerced into making a statement" during the August 14, 2008 meeting. (Id. at 14.)

For the reasons discussed above, Judge Johnson correctly determined that the July 10, 2008, August 1, 2008,

25

AO 72A
(Rev.8/8
2)

and August 10, 2008 contacts were not custodial interrogations. The agents consequently had no obligation to provide Defendant with <u>Miranda</u> warnings during those contacts.

The Court agrees with Judge Johnson that the only custodial interrogation requiring <u>Miranda</u> warnings occurred on October 17, 2011, when agents arrested Defendant at the Atlanta airport. (Non-Final Report & Recommendation at 14.) On that date, SA Barnes advised Defendant of his <u>Miranda</u> rights, both orally and in writing. By signing the waiver of rights form, Defendant acknowledged that he understood his rights and was willing to talk. Defendant spoke to the agents, and never exercised his rights to remain silent or to speak to a lawyer. Under those

AO 72A
(Rev.8/8
2)

circumstances, the Court agrees with Judge Johnson that "the undisputed evidence shows that [D]efendant received notice of his rights before he was subjected to custodial interrogation and made any incriminating statements." (Id.) The Government consequently has established the first prong of the two-part inquiry.

## 2. Voluntariness

Whether a confession or incriminating statement is voluntary depends on whether, under all of the surrounding circumstances, the statement was the product of the accused's "free and rational" choice. Jones, 32 F.3d at 1516. In Arizona v. Fulminate, 499 U.S. 279, 285-88 (1991), the Supreme Court held that the issue of voluntariness is determined by the totality of the

27

circumstances. In evaluating the totality of the circumstances, the district court must assess whether law enforcement conduct was "causally related" to the confession. <u>Jones</u>, 32 F.3d at 1516-17. The United States Court of Appeals for the Eleventh Circuit applies the following standard:

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. Isolated incidents of police deception, and discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice.

<u>United States v. Mendoza-Cecelia</u>, 963 F.2d 1467, 1475 (11th Cir. 1992).

The Court agrees with Judge Johnson that the evidence in this case demonstrates that Defendant was not

28

subjected to an exhaustingly long interrogation. (Non-Final Report & Recommendation at 15.) Indeed, the interrogation lasted for approximately one hour. (Id.) Further, the evidence demonstrates that the agents never applied physical force to Defendant, and that the agents never threatened to use physical force against him. (Id.) The evidence further shows that the agents did not promise Defendant anything to induce an confession. (Id.) Judge Johnson therefore correctly determined that, "under the totality of the circumstances, [Defendant] made a knowing, voluntary, and intelligent waiver of his right to remain silent." (Id.) The Court therefore finds that the Government has satisfied the second prong of the two-part inquiry.

29

AO 72A
(Rev.8/8
2)

Defendant contends that the "continuous harassment" that he suffered upon his arrival in the United States broke down his free will. (Def.'s Br. Supp. Mot. Suppress Statements at 3.) The Court agrees with Judge Johnson that "two border searches separated by eighteen months does not constitute continuous harassment." (Non-Final Report & Recommendation at 16.) Additionally, as Judge Johnson pointed out, Defendant failed to submit any evidence showing that any improper conduct occurred during the two border searches. (Id.) Further, no evidence indicates that either SA Barnes or SA Roy used the border searches to initiate contact with Defendant. (Id.) The Court therefore finds Defendant's argument unpersuasive.

AO 72A
(Rev.8/8
2)

Defendant also argues that the agents purposefully withheld his property to force him to speak with them. (Def.'s Br. Supp. Mot. Suppress Statements at 3-5.) According to Defendant, SA Barnes told him that if he wanted to have his cell phones returned, he would have to sign a consent to search form for his laptop and come to SA Barnes' office to retrieve the phones. (Id. at 4.) The Court agrees with Judge Johnson that the record does not support that argument. (Non-Final Report & Recommendation at 16.) Instead, the record demonstrates that Defendant was interested in the speedy return of his belongings, and that SA Barnes simply accommodated Defendant by obtaining the cell phones from DHS to return to Defendant, who happened to be in south Florida where SA Barnes' office

AO 72A
(Rev.8/8
2)

was located.  (Id.)  The Court agrees with Judge Johnson that, absent a request from Defendant, this meeting would not have occurred.    (Id.)  Judge Johnson also correctly found that "there is no evidence that SA Barnes made a promise to induce [D]efendant to do or say anything against his will."  (Id. at 16-17.)    Under those circumstances, Defendant's second argument does not warrant suppressing Defendant's statements.

### 3.    Summary

In sum, the Court finds that, with the exception of the October 17, 2011 statements, Defendant's statements did not occur during custodial interrogations.  Consequently, no <u>Miranda</u> warnings were required for any of the contacts with Defendant <u>except</u> the October 17, 2011 contact.  The Court

AO 72A
(Rev.8/8
2)

finds that, with respect to the October 17, 2011 contact, the agents complied with the <u>Miranda</u> requirements. Further, the Court concludes that the statements made by Defendant were voluntary. The Court therefore adopts the Non-Final Report and Recommendation and denies Defendant's Motion to Suppress Statements.

## IV. Conclusion

ACCORDINGLY, the Court **ADOPTS** the Non-Final Report and Recommendation of United States Magistrate Judge Walter E. Johnson [48], and **DENIES** Defendant's Motion to Suppress Statements.

IT IS SO ORDERED, this the 16 day of May, 2012.

_____
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/8
2)